IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHAEL DESANTO <br> 252 Masters Drive <br> Pottstown, PA 19464 <br><br> Plaintiff, <br><br> v. <br><br> IKEA NORTH AMERICAN SERVICES, LLC <br> d/b/a IKEA <br> 420 Alan Road <br> Conshohocken, PA 19428 <br><br> Defendant. | CIVIL ACTION <br><br> No.: 21-1533 <br><br><br> **JURY TRIAL DEMANDED** |

**FIRST AMENDED CIVIL ACTION COMPLAINT**

Michael DeSanto (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) by and through his undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1. Plaintiff has initiated this action to redress violations by Defendant Ikea North American Services, LLC (*hereinafter* referred to as "Defendant") of Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000(d) *et. seq*), the Age Discrimination in Employment Act ("ADEA" - 29 U.S.C. §§ 621 *et. seq.*), the Family and Medical Leave Act ("FMLA"), and the Pennsylvania Human Relations Act ("PHRA"). As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3. This Court may properly assert personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) an (b)(2), venue is properly laid in this district because Defendants are deemed to reside where they are subjected to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

5. Plaintiff is proceeding herein under Title VII and the ADEA after properly exhausting all administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety ("90") days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## PARTIES

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual with an address as set forth in the caption.

8. Defendant Ikea North American Services LLC operates store locations nationally doing business as "IKEA" (selling home-furnishing(s) and other related products) and is headquartered in Conshohocken, Pennsylvania.

9. At all times relevant herein, Defendant acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendants.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff was hired by Defendant on or about October 1, 2017, and at all times relevant *herein* worked as a "Recruitment Delivery Manager."

12. At all times, Plaintiff was based out of Defendant's United States headquarters, which was their Conshohocken, PA location (address set forth in the Caption).

13. In total, Plaintiff was employed by Defendant for a little less than three (3) years.

14. As a Recruitment Delivery Manager, Plaintiff worked within Defendant's Human Resources Department supervising a group of direct reports in the "Talent Department," in all aspects of recruitment/hiring/retention.

15. For nearly the entirety of Plaintiff's employment, he directly reported to Eleanor Tattar, Vice President of Succession Planning/Talent Manager.

16. At all relevant times *herein*, Tattar directly reported to Philip Wellington, "Head of People" (Chief Human Resources Officer)("CHRO") for the United States.[1]

---

[1] Mr. Wellington at all times relevant *herein* reported to Defendant's President (US), one Javier Quinones.

17. On or about May 11, 2020, Plaintiff commenced a federally-protected medical leave of absence under the Family and Medical Leave Act ("FMLA"), as he commenced paternity leave for the birth of his child.

18. Plaintiff's paternity leave was formally approved by Defendant as FMLA-qualifying leave.

19. At all times, Plaintiff's anticipated return date from FMLA was on or about August 3, 2020 (as Plaintiff was entitled to and intended to take his full 12-week federal entitlement).

20. Importantly, prior to May 11, 2020, and prior to invoking his FMLA rights, Plaintiff was <u>never</u> counseled or disciplined once.

21. In fact, on or about May 7, 2020 and less than 1 week before commencing his FMLA leave, Plaintiff had received his mid-year evaluation / review from his manager (Tattar).

22. Tattar rated Plaintiff as generally *exceeding* expectations with significant positive praise.

23. Therefore, the <u>only</u> intervening actions that resulted in Plaintiff's termination in mid-August of 2020 (when he was terminated) were: (a) his actual FMLA leave; and (b) subsequent expressed concerns of discrimination, as discussed *infra*.

24. On or about June 2, 2020, Tattar was placed on an involuntary leave, pending an investigation; Plaintiff was not privy to the details of any "investigation" concerning Tattar.

25. In fact, being on FMLA leave, Plaintiff had not learned of Tattar's involuntary leave as aforesaid until after-the-fact.

26. While not required, Plaintiff was the type of employee who at least tried to stay in general touch with colleagues and management, even if during an FMLA leave.

27. On or about July 15, 2020, Plaintiff contacted Katie Wagner ("Wagner"), a colleague in the same general position as Plaintiff and inquired about Tattar; Wagner informed

Plaintiff that she was unable to share any information and suggested Plaintiff contact Tanesha Carter (the interim replacement for Tattar)(and whose title was "Vice President of HR Operations and Continuous Improvement").

28.Wanting to generally understand what was occurring in light of Plaintiff's anticipated return in a few weeks, he requested a call with Carter; Carter scheduled a call at 11 AM on July 16, 2020.

29.To Plaintiff's surprise, Wellington participated in the call with himself and Carter. During this call (on 7/16/20), Plaintiff was informed:

- Tattar was no longer employed by Defendant (a separation which Plaintiff came to learn was on or about July 14, 2020, a few days earlier); and

- Carter was going to be Plaintiff's interim manager upon his return from FMLA leave (as he was scheduled to return on August 3, 2020).

30.Plaintiff was later informed in the evening (of July 16, 2020) by way of a separate call that a complaint had been made about him and an investigation was being undertaken. This information was conveyed to Plaintiff by Phillip Wellington and Emily Wellington (a People & Culture Business Partner).

31.*Roughly nine (9) business days prior to Plaintiff's return from FMLA leave* (and after being on such leave for about ten (10) weeks), Plaintiff was told that <u>he</u> was now under investigation (which ultimately delayed his return to work).

32.Plaintiff was given no meaningful details other than being informed a third party would reach out to him.

33.On or about July 24, 2020, Plaintiff was informed by Phillip Wellington that he needed to execute a confidentiality agreement (which Plaintiff did) and that Andrew Knauss (from the law firm of Potter & Murdock, P.C.) would interview Plaintiff.

5

34. On or about July 31, 2020, Plaintiff was interviewed by Knauss and another attorney (Barbara Johnson). During his interview with Potter counsel:

- Plaintiff was questioned about his relationship with various other colleagues or management in general;

- Plaintiff was asked multiple times if he had contact with Tattar, with such questions somewhat inferring it was problematic if he had communicated with her in any manner;

- Plaintiff was asked about his qualifications and some general work matters; and

- Plaintiff was not informed of any follow-up or next steps, only that he would be contacted by Phillip Wellington for additional guidance.

35. During his interview on July 31, 2020, Plaintiff also greatly emphasized his own discrimination concerns to Potter counsel. This "discrimination" component of his conversation and interview on July 31, 2020 is not identified in a bullet point above --- because it is simply <u>too important</u> to be potentially drowned out by other immaterial, scattered, and abstract questioning Plaintiff endured.

36. Plaintiff had a colleague on his team, one Richard Carsley (a/k/a "Rick"); Carsley was, in Plaintiff's opinion, discriminatory based upon age and gender in the workplace (and also with respect to hiring and candidates).

37. Plaintiff had previously escalated his discrimination concerns to Tattar, and he reiterated such concerns with numerous examples to Potter Counsel <u>on July 31, 2020</u>.

38. On or about August 10, 2020, Plaintiff participated in call with Phillip Wellington and Carter wherein they informed him that he could resume working the following day (on August 11, 2020).

39. Notably, this alleged "investigation" delayed Plaintiff's legal entitlement of return from FMLA by over a week – and even as of this call (on 8/10/20) – Plaintiff was still <u>never once</u> informed of any actual concern that had supposedly been expressed about him; and, this of course,

6

was contrary to prior discussions with management wherein he was led to believe he would be informed of any specifics and have the opportunity to respond accordingly.

40. On August 11, 2020, Plaintiff returned to work (after a near 14-week absence).

41. After only having worked three (3) business days, Plaintiff was contacted by Phillip Wellington on or about August 17, 2020 (with Emily Wellington present); in this call, Plaintiff was informed: (1) Phillip Wellington made the decision to terminate him; and (2) "We are an at-will employer and do not need to give you a reason why," when Plaintiff pressed for any plausible explanation or rationale for his abrupt termination.

42. Only after he was terminated did Plaintiff receive a "corrective action" identifying that he was terminated for *inter alia*: (1) being disrespectful at some point within a few days of his return from FMLA with colleagues; (2) various unspecified colleagues didn't like his management style; and (3) his unspecified actions created an "unsustainable working dynamic."

43. Nothing about Plaintiff's termination made any sense, as he had generally great working relations with colleagues, was well respected by management, and had received significant praise pre-FMLA leave.

44. In fact, Plaintiff's performance reviews, welcome-backs from colleagues, and prior surveys contradict any contrived allegations for his pretextual termination.

45. Plaintiff had never been presented with any progressive warning or discipline; and being an HR professional, it was obvious the corrective action was nothing short of this company creating a fabricated "paper trail."

46. Plaintiff therefore claims he was discriminatorily and retaliatorily terminated, and such unlawful reasons include but are not limited to: (a) his use of FMLA leave; (b) his complaints of (age and gender) discrimination in the workplace by Carsley; (c) Phillip Wellington being specifically upset with discrimination concerns having been expressed about Carsley, *whom he*

*was upon information and belief close with*; and (d) fabricating false reasons for terminations of HR personnel who were potential and actual witnesses for Tattar.

47. Defendant Ikea has a pattern and practice of retaliating against its employees and terminated at least two (2) other employees in the same time frame who came forward with formal complaints of formal discrimination against Carsley, who were also "investigated" and abruptly terminated immediately thereafter (just as with Plaintiff).

## COUNT I
### Violation of Title VII of the Civil Rights Act of 1964 ("Title VII")
**(Retaliation for Complaining of Gender Discrimination)**

48. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

49. Plaintiff engaged in protected conduct under Title VII on several occasions leading to his separation, but most recently on July 31, 2020.

50. Plaintiff was terminated in close proximity thereafter for completely false and pretextual reasons.

51. These actions as aforesaid constitute violations of Title VII.

## COUNT II
### Violations of the Age Discrimination in Employment Act ("ADEA")
**(Retaliation for Complaining of Age Discrimination)**

52. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

53. Plaintiff engaged in protected conduct under ADEA on several occasions leading to his separation, but most recently on July 31, 2020.

54. Plaintiff was terminated in close proximity thereafter for completely false and pretextual reasons.

55. These actions as aforesaid constitute violations of the ADEA.

## COUNT III
### Violation(s) of the Family and Medical Leave Act ("FMLA")
**(Interference & Retaliation)**

56. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

57. At all times *herein* Plaintiff worked for Defendant, who was engaged in interstate commerce, and Plaintiff worked at least 1, 250 hours and more than 1 year when he commenced FMLA Leave on or about May 11, 2020.

58. Plaintiff's FMLA was approved for a full twelve weeks as FMLA-qualifying leave.

59. Defendant impermissibly interfered with Plaintiff's right to reinstatement upon his expiration of leave, impermissibly delayed his return to work without justification, and terminated him in retaliation for exercising his rights under the FMLA.

60. All of Defendant's actions as aforesaid constitute interference and retaliation violations of the FMLA, and also unlawful dissuasion.

## COUNT IV
### Violation of Pennsylvania Human Relations Act ("PHRA")
**(Retaliation for Complaining of Gender Discrimination)**

61. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

62. Plaintiff engaged in protected conduct under PHRA on several occasions leading to his separation, but most recently on July 31, 2020.

63. Plaintiff was terminated in close proximity thereafter for completely false and pretextual reasons.

64. These actions as aforesaid constitute violations of PHRA.

## COUNT V
## <u>Violation of Pennsylvania Human Relations Act ("PHRA")</u>
### (Retaliation for Complaining of Age Discrimination)

65. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

66. Plaintiff engaged in protected conduct under PHRA on several occasions leading to his separation, but most recently on July 31, 2020.

67. Plaintiff was terminated in close proximity thereafter for completely false and pretextual reasons.

68. These actions as aforesaid constitute violations of the PHRA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation); and

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: */s Christine E. Burke*
    _____

Christine E. Burke, Esq.
Ari R. Karpf, Esq.
3331 Street Rd.
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: October 13, 2021